# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BORO BUZDUM,

     Plaintiff,

     v.                                       Case No. 06-C-159

VILLAGE OF GERMANTOWN,

     Defendant.

# DECISION AND ORDER

The plaintiff, Boro Buzdum, filed this action on February 6, 2006, challenging the constitutionality of the Village of Germantown's sexually oriented business ordinance, § 12.24, the zoning scheme as it relates to adult expression, and the prohibition on nudity and semi–nudity in establishments that hold a liquor license, § 12.02(7)(i). On February 24, 2006, the plaintiff filed a motion for a preliminary injunction seeking relief from the prohibition on nudity and semi–nudity in establishments with a liquor license. On March 20, 2006, the village repealed the prohibition and the plaintiff then withdrew his preliminary injunction motion. On April 26, 2006, the plaintiff filed a motion for partial summary judgment addressing the facial validity of the repealed prohibition, § 12.02(7). The plaintiff was granted leave to file a supplemental complaint alleging "as applied" constitution violations. On December 1, 2006, both the plaintiff and the defendant, the Village of Germantown, filed motions for summary judgment. (Docket #66 and #53, respectively). These motions will be addressed herein.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was

assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## MOTIONS FOR SUMMARY JUDGMENT

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460–61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule

- 2 -

56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e). The evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]; Fed. R. Civ. P. 56 [e]).

Challenges to the admissibility of evidence may be properly brought within the context of a summary judgment motion. Federal Rules of Civil Procedure 56(e) expressly provides in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

(Emphasis added). See also, Halloway v. Milwaukee County, 180 F.3d 820, 827 n.9 (7th Cir. 1999) (upholding district court's exclusion on summary judgment of portions of affidavit as hearsay). Proposed findings of fact to which the plaintiff properly objected on hearsay grounds are not included in the relevant facts set forth in this decision. See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997 ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.")

Before setting out the relevant facts which are based upon consideration of the parties' submissions, the court notes that Civil L.R. 56.2 (E.D. Wis.) sets forth additional requirements for motions for summary judgment. The court of appeals for this circuit "repeatedly upheld the strict enforcement of the requirements of district court local rules." See Waldridge, 24 F.3d at 921.

- 3 -

Specifically, Civil L. R. 56.2(b)(1) provides that any response to a motion for summary judgment "must include:"

> A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists.

Likewise, Civil L.R. 56.2(b)(2) further provides that the movant responding to the opposing party's findings of fact must do so "in accordance with the provisions of subparagraph (b)(1) of this rule." To the extent a party has not provided evidentiary support for its opposition to a particular proposed finding of fact, such party has not raised an arguable factual dispute. The court also notes that Civil L.R. 56.2(e) provides that the court <u>must</u> conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out.

The parties filed cross–motions for summary judgment. However, this fact alone "does not warrant a court granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute." <u>Mitchell v. McCarty</u>, 239 F.2d 721, 723 (7th Cir. 1957). If material facts are in dispute, neither party is entitled to summary judgment. <u>Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt</u>, 700 F.2d 341, 349 (7th Cir. 1983).

- 4 -

Since 2001, the plaintiff has operated a tavern known as Diamonds Pub and Grill ("Diamonds"), located at W188 N10515 Maple Road in the Village of Germantown, Washington County, Wisconsin. When the plaintiff first operated the tavern, the plaintiff leased the property. This year the plaintiff purchased the property for $550,000. Currently, he is the sole owner. The tavern has a Class B liquor license and is licensed to sell alcoholic beverages by the drink.

In August 2005, the plaintiff decided that he would begin offering nude or semi–nude dance entertainment for the customers at his tavern. It is his intention to operate a sexually–oriented business that has, as a significant part of its business, the showing of specified anatomical areas or specified sexual activity. If allowed by law, he would operate as an "adult cabaret" "365 days a year," offering nude and semi–nude dancing "all the time." (Deposition of Boro Buzdum [Buzdum Dep.] at 64, 70).

The plaintiff would offer primarily female dancers, but on occasion would offer male dancers, such as during "deer hunters' widows' balls." Id. at 63–64. He would offer "the deer hunters' widows' balls" "when all of the men go hunting." Id. at 63. Deer hunting season begins "right before Thanksgiving and goes for two weeks." Id. at 71. Further, the plaintiff intends to operate as an adult business while continuing to serve alcohol.

The plaintiff first picked up a copy of Germantown Sexually Oriented Business Ordinance, § 12.24, as well as an application early in 2006. He did not review the materials,

----

[1]As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

but gave them to his attorney. The plaintiff learned that he could not lawfully present nude or semi–nude dance entertainment according to the Germantown ordinances as they stood at that time.

The plaintiff does not anticipate filing an application unless his attorney advises him to do so. He has never submitted any type of application to operate as an adult oriented business in Germantown. Moreover, the plaintiff has never sought a permit to operate as an adult cabaret as a conditional use or as an unclassified use. He has never talked to any official at the Village about changing the operations of his business. Diamonds is currently commercially zoned in the B–3 District and is less than 1,000 feet from a residentially zoned property.

In enacting § 12.24, the Village assembled extensive legislative record to support the regulation of sexually oriented businesses. The legislative record supporting § 12.24 contains more than 1,200 pages. The record contained studies, court decisions, ordinances from other cities, and other materials all supporting the Village's rationale that sexually oriented businesses should be regulated to deduce harmful secondary effects. The following studies, court decisions, and other materials were considered by the Village Board in passing ordinance 12–01:

City of Phoenix Planning Department Adult Business Study ("Phoenix Study"); Final Report to the City Of Garden Grove: The Relationship Between Crime and Adult Business Operations On Garden Grove Blvd; Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles ("Los Angeles Study"); Whittier, California Staff Report Amendment to Zoning Regulations Adult Businesses in C–2 Zone With Conditional Use Permit (January 9, 1978) ("Whittier Report"); Analysis of Adult Business

- 6 -

Studies in Indianapolis, Indiana and Los Angeles, California; Adult Entertainment Business in Indianapolis: An Analysis (1984) ("Indianapolis Study"); An Analysis of the Relationship Between Adult Entertainment Establishments, Crime, and Housing Values Submitted to the Consumer Services Committee, Minneapolis, Minnesota City Counsel (1980) ("Minneapolis Study"); Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses by the Attorney General for the State of Minnesota (1989) ("Minnesota Report"); Oklahoma City Land Use Study (1986) ("Oklahoma Study"); Quality of Life: A Look at Successful Abatement of Adult Oriented Business Nuisance in Oklahoma City, Oklahoma (1984–1989) ("Oklahoma Study"); A Report on Zoning and Other Methods of Regulating Adult Entertainment in Amarillo (1977) ("Amarillo Study");Report on Adult Oriented Businesses in Austin (1986) ("Austin Study");A Report Prepared by City of Beaumont, Texas (1982) ("Beaumont Study");Houston City Counsel: Sexually Oriented Business Ordinance Revision Committee Legislative Report; and Regulation of Adult Entertainment Establishments in St. Croix County, Wisconsin (1993) ("St. Croix Study"); City of Bellevue Planning Directors Memorandum Regarding Location of Adult Entertainment Uses. (1988) ("Bellevue Study").

The legislative record also contained the findings of several published court decisions as evidence supporting the amendment of the ordinance. The Village of Germantown also considered surveillance reports pertaining to the incidence of AIDS, HIV and other sexually transmitted diseases issued by the Center for Disease Control and related Wisconsin agencies when enacting § 12.24. Additionally, the Village Board considered many facts and figures pertaining to pornography as it relates to the economy, children and rape and reviewed several articles and publications on the subject of the secondary effects of sexually oriented businesses. The Village Board also considered other materials when enacting § 12.24.48.

- 7 -

On August 6, 2001, the Village of Germantown adopted Ordinance 12–01, repealing and recreating § 12.24 of the Municipal Code of Ordinances pertaining to regulation of sexually oriented businesses. (Affidavit of Elizabeth Knaack [Knaack Aff.], Exh. 1). Under this ordinance, "[a]ll ordinances or parts of ordinances in conflict with the provisions of this ordinance are hereby repealed." Id. The ordinance's preamble states that its intention is to regulate the harmful secondary effects of sexually oriented businesses without suppressing any speech activities protected by the first amendment, as follows:

> **WHEREAS,** sexually oriented businesses require special supervision in order to protect and preserve the health, safety, and welfare of the patrons of such businesses as well as the citizens of the communities where they locate, and

> **WHEREAS**, the Village Board of the Village of Germantown finds that sexually oriented businesses are frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a casual nature; and

> **WHEREAS**, the concern over the sexually transmitted diseases is a legitimate health concern of the Village that demands reasonable regulation of sexually oriented businesses in order to protect the health and well–being of the citizens; and

> **WHEREAS**, licensing is a legitimate means of accountability to ensure that operators of sexually oriented businesses comply with reasonable regulations, and to ensure that operators do not allow their establishments to be used as places of illegal sexual activity or solicitation; and

> **WHEREAS**, there is convincing documented evidence that sexually oriented businesses, because of their very nature, have a deleterious effort on both the existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the downgrading of property values; and

> **WHEREAS**, it is recognized that sexually oriented businesses, due to their nature, have serious objectionable operational characteristics, particularly when they are located in proximity to each other, thereby contributing to urban blight and downgrading the quality of life in the adjacent area; and

- 8 -

**WHEREAS**, the Village Board wants to prevent these adverse effects and thereby protect the health, safety and welfare of the citizenry; protect the citizens from increased crime; preserve the quality of life; preserve the property values and character of surrounding neighborhoods and deter the spread of urban blight; and

**WHEREAS**, it is not the intent of this ordinance to suppress any speech activities protected by the First Amendment, but to enact a content neutral ordinance that address the secondary effects of sexually oriented businesses as well as the health problems associated with such businesses; and

**WHEREAS**, it is not the intent of the Village Board to condone or legitimized the distribution of obscene materials, and the Board recognizes that the state and federal law prohibits the distribution of obscene materials and expects and encourages state enforcement officials to enforce state and federal obscenity statues against any such illegal activities in the Village of Germantown.

**WHEREAS**, as required by § 66.0103 Wisconsin Statutes, a copy of said Code has been on file and open for public inspection in the office of the Village Clerk for not less then two (2) weeks and notice thereof was given by publication on July 18, 2001, in the official newspaper of the Village.

Subsection 1 of the Sexually Oriented Business Ordinance contains the following legislative

statements pertaining to the purpose of the law and the findings upon which it is based:

(a)    <u>Purpose</u>.  It is the purpose of this ordinance to regulate sexually oriented businesses and related activities to promote the health, safety, morals, and general welfare of the citizens of the Village, and to establish reasonable and uniform regulations to prevent the deleterious location and concentration of sexually oriented businesses within the Village. The provisions of this ordinance have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including sexually oriented materials.  Similarly, it is not the intent or effect of this ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market.  Neither is it the intent nor effect of this ordinance to condone or legitimize the distribution of obscene materials.

(b)    <u>Findings</u>. Based on evidence concerning the adverse secondary effects of adult uses on the community presented in hearings and in reports made available to the Village Board, and on findings incorporated in the

cases of *City of Erie v. Pap's A.M.*, 529 U.S. 277, 146 L. Ed. 2d 265, 120 S. Ct. 1382 (2000); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560 (1991); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986); *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, (1986); *Iacobucci v. City of Newport, Ky,* 479 U.S. 92 (1986); *Young v. American Mini Theatres,* 426 U.S. 50 (1976); *California v. LaRue,* 409 U.S. 109 (1972); *United States v. O'Brien,* 391 U.S. 367 (1968); *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403 (6TH Cir. 1997); *Kev, Inc. v. Kitsap County,* 793 F.2d 1053 (9th Cir. 1986); *Hang On, Inc. v. City of Arlington.* 65 F.3d 1248 (5th Cir. 1995); *South Florida Free Beaches, Inc. v. City of Miami,* 734 F.2d 608 (11th Cir. 1984); and *N.W. Enterprises v. City of Houston,* 27 F. Supp. 2d 754 (S.D. Tex. 1998)), as well as studies conducted in other cities including, but not limited to, Phoenix, Arizona; Minneapolis, Minnesota; Houston, Texas; Indianapolis, Indiana; Amarillo, Texas; Garden Grove, California; Los Angeles, California; Whittier, California; Austin, Texas; Seattle, Washington; Oklahoma City, Oklahoma; Cleveland, Ohio; and Beaumont, Texas; and findings reported in the Final Report of the Attorney General's Commission on Pornography (1986), the Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses (June 6, 1989, State of Minnesota), and statistics obtained from the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, the Village Board finds that:

1.  Sexually oriented businesses lend themselves to ancillary unlawful and unhealthy activities that are presently uncontrolled by the operators of the establishments. Further, there is presently no mechanism to make owners of these establishments responsible for the activities that occur on their premises.

2.  Crime statistics show that all types of crimes, especially sex–related crimes, occur with more frequently in neighborhoods where sexually oriented businesses are located. *See, e.g.,* Studies of the cities of Phoenix, Arizona; Indianapolis, Indiana; and Austin, Texas.

3.  Sexual acts, including masturbation, and oral and anal sex, occur at sexually oriented businesses, especially those which provide private or semi–private booths or cubicles for viewing films, videos, or live sex shows. *See, e.g., California v. LaRue,* 409 U.S. 109, 111 (1972); *See also* Final Report of the Attorney General's Commission on Pornography (1986) at 290, 1475–76.

4.  Offering and providing such booths and/or cubicles encourages such activities, which creates unhealthy conditions. *See, e.g.,*

- 10 -

Final Report of the Attorney General's Commission on Pornography (1986) at 290, 1474–76.

5.      Persons frequent certain adult theaters, adult arcades and other sexually oriented businesses, for the purposes of engaging in sex within the premises of such sexually oriented businesses. *See, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 698 (1986); *see also* Final Report of the Attorney General's Commission on Pornography (1986) at 290, 1474–76.

6.      At least 50 communicable diseases may be spread by activities occurring in sexually oriented businesses including, but not limited to, syphilis, gonorrhea, human immunodeficiency virus infection (HIV–AIDS), genital herpes, hepatitis B, Non A, Non B amebiasis, salmonella infections, and shigella infection, *See e.g.*, Study of Fort Meyers, Florida.

7.      As of December, 1996, the total number of reported cases of AIDS in the United States caused by the immunodeficiency virus (HIV) was 774,467. *See, e.g.,* Statistics of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, HIV/AIDS Update at 3.

8.      As of the June 30, 2001, there have been 4,776 reported cases of AIDS in Wisconsin. *See, e.g.*, Wisconsin Department of Health & Family Services:  Wisconsin HIV/AIDS Quarterly Surveillance Summary, Cases Reported 1982 through June 30, 2001.

9.      The total number of cases of genital Chlamydia trachomatis infections in the United States reported in 1999 was 659,441, an 8.5% increase over the year 1998. *See, e.g.,* Statistics of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

10.     The total number of cases of primary and secondary (Recent infections) syphilis in the United States reported during the twelve year period 1987–1999 was 345,696. *See, e.g.,* Statistics of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

11.     The number of cases of gonorrhea in the United States reported annually remains at a high level, with a total of 1,759,348 cases reported during the period 1995–1999. *See, e.g.* Statistics of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

- 11 -

12. The surgeon general of the United States in his report of October 22, 1986, advised the American public that AIDS and HIV infection may be transmitted through sexual contact, intravenous drug use, exposure to infected blood and blood components, and from an infected mother to her newborn.

13. According to the best scientific evidence available, AIDS and HIV infection, as well as syphilis and gonorrhea, are principally transmitted by sexual acts. *See, e.g. F*indings of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

14. Sanitary conditions in some sexually oriented businesses are unhealthy, in part, because the activities conducted there are unhealthy, and in part, because of the unregulated nature of the activities and the failure of the owners and operators of the facilities to self–regulate those activities and maintain those facilities. *See, e.g.*, Final Report of the Attorney General's Commission on Pornography (1986) at 290, 1473–76.

15. Numerous studies and reports have determined that bodily fluids, including semen and urine, are found in the areas of sexually oriented businesses where persons view "adult" oriented films. *See, e.g.,* Final Report of the Attorney General's Commission on Pornography (1986) at 290, 1476.

16. Nude dancing in adult establishments encourages prostitution, increases sexual assaults, and attracts other criminal activity. *See, e.g., Barnes v. Glen Theatre,* 501 U.S. 560, 583 (1991).

17. Nude dancing in adult establishments increases the likelihood of drug–dealing and drug use. *See, e.g., Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1056 (9th Cir. 1986).

18. Alcohol consumption in adult establishments increases the likelihood of crime, illegal drug use, and illegal sexual activity, and encourages undesirable behavior that is not in the interest of the public health, safety, and welfare. *See, e.g., Artistic Entertainment, Inc. v. City of Warner Robins,* 223 F.3d 1306, 1309 (11th Cir. 2000); *Sammy's, Ltd v. City of Mobile,* 140 F.3d 993, 996 (11th Cir. 1998), *cert. denied,* 529 U.S. 1052, 146 L. Ed. 2d 459, 120 S. Ct. 1553 (2000).

19. The findings noted in paragraphs numbered (1) through (18) raise substantial governmental concerns.

- 12 -

20.     Sexually oriented businesses have operational characteristics which should be reasonably regulated in order to protect those substantial governmental concerns.

21.     A reasonable licensing procedure is an appropriate mechanism to place the burden of that reasonable regulation on the owners and operators of sexually oriented businesses. Further, such licensing procedure will place a heretofore non–existent incentive on operators to see that the sexually oriented business is run in a manner consistent with the health, safety, and welfare of its patrons and employees, as well as the citizens of the Village. It is appropriate to require reasonable assurances that the licensee is the actual operator of the sexually oriented business, fully in possession and control of the premises and activities occurring therein.

22.     Removal of doors on adult booths and requiring sufficient lighting on the premises with adult booths advances a substantial governmental interest in curing the illegal and unsanitary sexual activity occurring in adult establishments.

23.     The disclosure of certain information by those persons ultimately responsible for the day–to–day operation and maintenance of the sexually oriented business, where such information is substantially related to the significant governmental interest in the operation of such uses, will aid in preventing the spread of sexually transmitted diseases and criminal activity.

24.     It is desirable, in the prevention of crime and the spread of communicable diseases, to obtain a limited amount of information regarding certain employees who may engage in the conduct this ordinance is designed to prevent, or who are likely to be witnesses to such activity.

25.     The fact that an applicant for a sexually oriented business license has been convicted of a sex–related crime leads to the rational assumption that the applicant may engage in that conduct in contravention to this ordinance.

26.     The barring of such individuals from operation or employment in sexually oriented businesses for a period of five (5) years for a previous felony conviction serves as a deterrent to further criminal conduct, and prevents conduct which leads to the transmission of sexually transmitted diseases.

Case 2:06-cv-00159-PJG   Filed 10/12/07   Page 13 of 62   Document 97

27. The general welfare, health, morals, and safety of the citizens of this Village will be promoted by enactment of this ordinance.

Section 12.24(13) provides that "[s]exually oriented business shall be permitted in any commercial zoning district." The commercial zoning districts are the B–1 to B–5 districts as contained in Village of Germantown's Zoning Code, Chapter 17. Chapter 17 provides that its purpose "is to promote the health, safety, morals, prosperity, aesthetics and general welfare of the Village." § 17.03. Moreover, "[i]t is not intended by [Chapter 17] to … impair or interfere with any existing … ordinances …[or] regulations…issued pursuant to law." See § 17.05.

On January 16, 2006, the Village Planner sent the plaintiff a letter. The letter advised that "a change to an adult oriented business ... shall comply with all Local regulations listed within the Code." (Knaack Aff., Exh. 9). He further advised that "[a] change in operation to an Adult Oriented Business, without obtaining the proper licenses and approvals, may result in enforcement action." Id.

On March 20, 2006, the Village of Germantown repealed § 12.02(7)(i). Section 12.02(7)(I) prohibited nudity or semi–nudity in establishments that hold a liquor license. After the repeal of the prohibition, the plaintiff decided to present an evening of erotic dance entertainment at his tavern on April 8, 2006. On April 7, 2006, during an alcohol license check, Village of Germantown police officers observed a flyer inside Diamonds scheduling a nude dancing show for April 8, 2006.

A few weeks prior to that date, the plaintiff had been advised by his attorney that "we could put on a one–time show of nude dancing in our club." (Buzdum Dep. at 75). He circulated a flyer in his bar, drafted entirely by his attorney and without his input, which stated: "Special Event: Once in a Lifetime – Don't You Deserve a Unique Night of Entertainment?

- 14 -

Nude Dancing Extravaganza – A Bevy of Beautiful Girls – Erotic and Exotic Dance – Titillating Performances." (Affidavit of Penny Schmitt [Schmitt Aff.], Exh. 10; Buzdum Dep. at 75). The entertainment was planned and advertised as a single one–time special event. Prior to April 8, 2006, the plaintiff had constructed a dressing room and a raised platform/dance floor. The dressing room contained a bench area, mirrors, lights and lockers.

The plaintiff decided to offer adult strippers that evening because "our goal is to have that kind of a business there." (Buzdum Dep. at 81). He is not trying to operate as any other type of adult business other than as an adult cabaret. Id. The plaintiff agrees that an establishment that offers adult entertainment provides a unique night of entertainment.

To arrange for the strippers that evening, the plaintiff contacted "Tiny," someone who worked for his brother's sexually oriented business known as TNT in Clyman, Wisconsin. The plaintiff knew that Tiny had connections with "some girls that were dancers, and he could ask them if they were interested in dancing." Id. at 84. The plaintiff told Tiny "something to the degree that I needed some dancers for a one–night show and if he had any girls that he could call and have them show up." Id. at 85. The plaintiff anticipated that Tiny would follow through and that strippers would be coming to his establishment on April 8, 2006.

Diamonds charged a $5.00 cover to its patrons that evening. Neither he nor Tiny checked into whether the strippers had a license or permit to dance as adult cabaret dancers. The plaintiff's expectations for the strippers that evening were that they were going to dance and entertain people just like strippers do at Silk Exotic or some of the other adult cabarets he has been to in Milwaukee. He expected that after the strippers go up on stage and dance for a few songs, they would come down to the floor and socialize with the men, soliciting lap dances or otherwise walking around clothed or unclothed. The plaintiff anticipated that the

- 15 -

strippers would show specified anatomical areas. Further, it would have been his expectation that the strippers mingle with the men with their breasts exposed.

On the afternoon of April 8, 2006, Germantown Police Captain Michael Snow received information about the police officers' observations the prior evening and he decided to meet with the plaintiff. Captain Snow told the plaintiff that he could not present the erotic dance show and that if he did, the police would shut him down. The plaintiff said that he could show Captain Snow in the ordinance that he was allowed to put on a show, but that he did not have a copy of the ordinance with him at the bar. Captain Snow said he was on his way off duty and asked the plaintiff to call Lt. Schreihart if he wanted to continue the discussion. After their meeting, Captain Snow advised Lt. Schreihart that the meeting "went well" and he believed the plaintiff would not proceed with the show.

Later that afternoon, the plaintiff contacted Lt. Schreihart and explained that he had paperwork from the law firm of Crivello, Carlson & Mentkowski, S.C., indicating that § 12.02 had been repealed. He explained to Lt. Schreihart that he (Buzdum) had challenged the constitutionality of several ordinances in federal court, that the ordinance that prohibited nudity in taverns had been repealed, and that his attorney had advised him that he could have this type of event, as long as he did not do so "regularly."

Lt. Schreihart then spoke to Attorney John DeStefanis who advised that Diamonds did not have a sexually oriented business license and, even if it did, such a business is not permitted to serve alcohol. Lt. Schreihart re–contacted the plaintiff and shared this information. The plaintiff said that he wanted to follow the law, but that he had to follow the advice of his own attorney as to what the law allowed. Lt. Schreihart advised that if the plaintiff continued with the show, the Germantown Police Department would have no choice

- 16 -

but to respond to Diamonds and stop the show. The plaintiff went ahead with the erotic dance entertainment presentation which began at 8:15 p.m. that night.

At 7:00 p.m., the Germantown Police Department sent a plainclothes officer to observe the activities inside Diamonds and to monitor for violations of the tavern's license. At about the same time, Tiny arrived with five strippers and advised the plaintiff that the strippers were ready. The undercover officer observed several dancers go up on stage, take off their shirts and expose their breasts and nipples, collect gratuities, engage in lap dances, and walk about the room with their breasts exposed. The undercover officer then advised his lieutenant of the ordinance violations which he had observed.

After the undercover officer reported the activity, officers, led by Captain Snow, entered the tavern and assembled a line on the north wall. Captain Snow announced: "This establishment is closed, and I need you all to leave," or words to that effect. (Buzdum Dep. at 111, 112; Second Declaration of Boro Buzdum [Buzdum 2nd Declaration], ¶ 20). Captain Snow then spoke with the club's representative and another officer directed the bartender not to serve any more alcohol. The officers asked patrons to leave due to the fact that the tavern was being shut down. The officers met with no resistance and patrons and dancers cooperated and complied with the officers' request.

The plaintiff approached the Captain and was advised that he was in violation of the law. "I explained to him that my attorney advised me that we could do an one–time special dance, and he said no, and he asked all the patrons to get up and leave, and then that took a few minutes and then they went into the dressing room and interrogated the girls or talked to the girls and pretty much emptied out the building and locked us down." (Buzdum Dep. at 111). If the police had not arrived that evening, the plaintiff would have continued putting on

- 17 -

the performance. More specifically, he would go back to his attorney "as often as I could" for advise on whether or not he could put on another show. Id. at 124. In fact, he would contact his attorney every week to ask whether he could put on another adult entertainment show. As a result of the April 2006 show, Diamonds was issued a citation for operating a sexually oriented business without a license. The municipal case against the plaintiff is still pending.

At no time while the officers were present in Diamonds and communicating with its representatives or patrons was any force used against the tavern's representatives or patrons. The dancers were not physically touched or restrained in any way and voluntarily cooperated by agreeing to be escorted into the dressing room where they dressed and provided the statements as contained in the police report. The officers did not have a search warrant. At no time was the plaintiff restrained or physically escorted from the tavern. No arrests were made.

In October 2006, the plaintiff thought of putting on an all–male erotic dance program for the "deer hunting widows." (Buzdum 2nd Declaration, ¶ 27) Because he had been charged with a violation of the ordinance the previous April, he decided not to put on the show without also asking the Germantown Police Department in advance if they would approve of such a program, even after consulting his own attorney. The plaintiff had his bar manager, Tammy Maddox, talk to Captain Snow to obtain the approval of the Village before going ahead with the presentation. Captain Snow said he had no problem with the presentation that the plaintiff had in mind, so the plaintiff was able to put on that show on November 18, 2006.

On Monday, November 20, 2006, the Village of Germantown amended § 12.24. Many of the changes removed requirements relating to the information the operator of a sexually oriented business must provide to the Village in the application, such as fingerprints, social

- 18 -

security number, federal tax identification number, and conviction history relating to specified criminal activities. Amendments were also made which removed specified criminal activities and violations or noncompliance with provisions of the Village's ordinances as grounds for disallowance of an operator's license application. In addition, the amendments changed the zoning to include commercial or industrial zones, and reduced from 1,500 feet to 1,000 feet the required distance that a sexually oriented business must be from another sexually oriented business, residence, park, church, or school.

The former Village Planner/Administrator, Jason Gallo, undertook an analysis of the availability of land in Germantown for sexually oriented businesses to operate. After taking into consideration the 1,500 foot distance requirement under § 12.24(13) before it had been amended, Mr. Gallo determined that 142 parcels or part of a parcel were located a minimum of 1,500 feet from schools, parks, daycare centers, churches and residentially zoned areas. The parcels listed as numbers 6, 7, 10, 15, 16, 19, 20, 21, 28 – 35, 36, 38, 39, 42 and 43 in the Property Study are all located in the A–1 zoning district. The A –1 Agricultural District is intended to provide for the continuation of general farming and related uses in those area of the Village that are not committed to urban development and to protect rural lands in the Village from urban development until their orderly transition into urban–oriented districts is required.

Section 17.12 of the Germantown zoning code enumerates uses permitted in the A–1 Agricultural District. The zoning code does not allow an adult cabaret, as that term is defined at § 12.24(2)(b), to locate in the A–1 Agricultural District as a permitted use.

The parcels listed as number 40 and 41 on the Property Study are both located in the A–2 zoning district. The A–2 Agricultural District is intended to provide for, maintain, preserve

- 19 -

and enhance agricultural lands historically utilized for crop production, but which are not included within the A–1 Agricultural District and which are generally best suited for smaller farm units, including truck farming, horse farming, hobby farming, orchards and other similar agriculture–related farming activities. The uses enumerated at § 17.13 of the zoning code as permitted uses in the A–2 Agricultural District include, and are limited to, those uses permitted in the A–1 District. The zoning code does not allow an adult cabaret to locate in the A–2 Agricultural District as a permitted use.

The parcels listed as number 99–142 on the Property Study are all located in the AG zoning district. The "AG" zoning district referred to on the Property Study is an Agricultural District. The zoning code does not allow a an adult cabaret to locate in the AG District as a principal permitted use.

The parcels listed as number 35 A and 36 A on the Property Study are all located in the B–4 zoning district. The B–4 Professional Office District is intended to provide for individual or limited office, professional and special service uses where the office activity would be compatible with neighborhood uses and not exhibit the intense activity of other business districts. The zoning code does not allow an adult cabaret to locate in the B–4 Professional Office District as a permitted principal use.

The parcels listed as numbers 8, 17, 18, 23– 27, 37 A, 37 B, and 44 – 98 on the Property Study are all located in the M-1 zoning district. The M-1 Limited Industrial District is intended to provide for warehousing, manufacturing or fabrication operations which, on the basis of physical and operational characteristics, would not be detrimental to the immediate surrounding area or to the Village as a whole by reason of smoke, odor, noise, dust, flash, traffic, physical appearance, or other similar factors. The M-1 district is also intended to

- 20 -

establish such regulatory controls as will reasonably insure compatibility with the surrounding area in this respect. Section 17.33 of the Germantown zoning code enumerates the principal uses in the M-1 Limited Industrial District. The zoning code does not allow an adult cabaret to locate in the M-1 Limited Industrial District as a permitted principal use.

The parcels listed as numbers 1– 5 and 9 on the Property Study are all located in the M-2 zoning district. The M-2 General Industrial District is intended to provide for the same type of manufacturing and fabricating operations and uses as in the M-1 Industrial District, plus more intensive uses, in areas where the relationships to surrounding land use would create fewer problems of compatibility. The M-2 General Industrial District also permits those activities generally perceived as being of a nuisance nature or considered to be hazardous. The zoning code does not allow an adult cabaret to locate in the M-2 General Industrial District as a permitted principal use.

The parcels listed as number 11 – 14 on the Property Study are all located in the M-3 zoning district. The M-3 Special Use Industrial District is intended to allow for flexibility in the design of large, single-user, manufacturing or fabricating operations consisting of one such manufacturing or fabricating facility per lot in a manner which would not be detrimental to the surrounding area or to the Village as a whole. The zoning code does not allow a an adult cabaret to locate in the M-3 Special Use Industrial District as a permitted principal use. The Germantown zoning districts designated A–1, A–2, AG, M-1, M-2, and M-3 are not "commercial" districts.

The B–5 Highway Business District is intended to provide for the orderly and attractive grouping at appropriate locations along principal highway routes of those businesses and customer service establishments which are logically related to and dependent upon highway

- 21 -

traffic or which are specifically designed to serve the needs of such traffic. The uses enumerated in § 17.32 of the zoning code as permitted principal uses in the B–5 Highway Business District include, and are limited to, convenience food stores, petroleum service stations, hotels and motels, restaurants, and transit bus station. The zoning code does allow an adult cabaret to locate in the B–5 Highway Business District as a permitted principal use. However, the only two parcels listed on the Property Study that are located in the B–5 zoning district, parcels numbered 22 A and 22 B, are within 1500 feet of the property line of property upon which is being constructed La Fleurs Academy of Gymnastics.

The village's zoning code provides that only those principal uses specified for a district, their essential services, and accessory uses are permitted in any given district. Temporary uses and unclassified or unspecified uses "may be permitted by the Zoning Administrator." (Declaration of Toni Olson [Olson Declaration], Exh. F, § 17.07[3][a]). Conditional uses are "considered as special uses requiring review, public hearing, and approval by the Plan Commission in accordance with § 17.42" of the Zoning Code. Id., Exh. F, § 17.07(3)(c).

The Village Board may authorize the zoning administrator to issue a permit for conditional use after review and public hearing, provided that such conditional uses "are in accordance with the purpose and intent of this chapter and are found to be not hazardous, harmful, offensive or otherwise adverse to the environment or the value of the neighborhood or the community." Id., Exh. F, § 17.42(1). Once an application for a conditional use permit is filed, the Plan Commission reviews the site, the plans, neighboring uses, highway access, traffic, drainage systems, and the proposed operation. Id., Exh. F, § 17.42(3). The Plan Commission may recommend conditions such as landscaping, architectural design, type of

- 22 -

construction, fencing, operational control, hours of operation "upon its finding that these are necessary to fulfill the purpose and intent" of the zoning code. Id., Exh. F, §17.42(3).

A public hearing must be held. Id., Exh. F, § 17.42(4). Such a hearing requires that notice be published in a newspaper for two consecutive weeks and the hearing cannot be held until at least seven days following the last publication. Id., Exh. F, § 17.53. After the public hearing and after consideration of the recommendation of the Plan Commission, the Village Board may grant or deny the conditional use permit or may grant the permit with conditions deemed appropriate by the Board. Id., Exh. F, § 17.42(4).

Several of the 142 parcels were zoned commercial (i.e., business) and were available for sale and development. In particular, two sites identified as parcels 22A and 22B, were zoned B–5 and had 7.48 acres and 4.00 acres meeting the distance requirements, respectively. Those sites are suitable for generic commercial land uses since they met the zoning and distance requirements and are currently vacant. They were available on the market at the time. The sites identified as parcels 22A and 22B in Mr. Gallo's opinion had the best commercial characteristics for the location of commercial uses, including a sexually oriented business.

No sexually oriented businesses currently exist in the Village of Germantown. The plaintiff has not submitted an application for a sexually oriented business license. With regard to persons who have communicated to the Village an interest in, or have requested information about, operating a sexually oriented business in the Village of Germantown from 1999 to the present, the only inquires that have been made were those by plaintiff's representative and the business owner in the case involving Wil-kar, Inc. v. Village of

- 23 -

Germantown, 153 F.Supp.2d 982 (E.D. Wis. 2001).  The current population of Germantown is 19,189.

Apart from sites 22A and 22B, many additional sites in the agricultural or industrial zones could be made available through a change of zoning, such as by spot zoning.  For instance, sites identified as parcels 26–36 were located near the Holy Hill freeway interchange area and contain no flood plain and very little wetland.  As another example, the site identified in the Property Study as parcel 40 is an empty lot in an industrial zone.  It contains no wetlands or flood plains.  If the zoning changed, those sites could be suitable for generic commercial land uses.

The Village of Germantown has 20,080 acres.  Under Mr. Gallo's original analysis of available properties that meet the 1,500 foot distance requirement, he determined that there were 1,330.14 acres available for sexually oriented businesses.  The plaintiff has not talked to any official in Germantown about whether or not there are enough sites to operate a sexually oriented business.  He has not physically inspected any of the sites in Mr. Gallo's list of properties which may be available.  The plaintiff has never looked at any other commercially zoned sites, nor has he considered submitting any type of petition or request for a zoning change with respect to available properties that may be zoned other than commercial.  He has not taken a look to see whether any of these sites would sustain a commercial business.

On November 20, 2006, the Village amended § 12.24.  The amended ordinance does not include the phrase, "regularly, commonly, habitually, or consistently."  The subsection pertaining to persons who engage in exotic or erotic dancing or performances that are intended for sexual interests or titillation of an audience or customers was removed from the ordinance.

- 24 -

## ANALYSIS

### Plaintiff's and Defendants' Motions for Summary Judgment

The parties have filed cross motions for summary judgment addressing basically the same issues. Given the nature of the submissions and the issues presented, the parties' motions will not be addressed separately. Rather, the court will address the issues raised by the parties together taking into account the arguments they present in all of the briefs filed in support, response or reply to each of the motions.

The plaintiff seeks summary judgment as to liability on his claims that the Village of Germantown Sexually Oriented Business Ordinance, § 12.24(4)(a)1 violated his First Amendment rights.[2] The plaintiff asserts that the ordinance is facially overbroad and vague, as well as overbroad and vague as applied to him. The plaintiff also asserts that the ordinance is an unconstitutional prior restraint. Finally, the plaintiff asserts that the ordinance does not meet the requirements of a time, place and manner regulation of expression and is an unconstitutional regulation of expressive conduct.

In response to the plaintiff's motion, the defendants assert that the plaintiff's challenges to former section 12.24(2)(b) are made moot by the revised ordinance. Specifically, the defendants assert that the Village amended § 12.24(2)(b)'s definition of "adult cabaret" so that the plaintiff's overbreadth and vagueness challenges are in large measure made moot. The defendants also contend that the definition of "adult cabaret" is not overbroad and the ordinance is not impermissibly vague. The defendants further maintain that the plaintiff's prior restraint challenge to the terms of the ordinance and to law enforcement activities on April 8,

---

[2]The Village amended § 12.24 of the ordinance on November 20, 2006.

- 25 -

2006, fail as a matter of law. Specifically, the defendants claim that §§ 12.24(5)(d)(6) and (f) satisfy the prompt issuance requirements and that law enforcement activities on April 8, 2006, did not amount to prior restraint. Finally, the defendants contend that the ordinance passes intermediate scrutiny review because the location requirements leave open sufficient alternative sites for adult businesses and the hours of operation are narrowly tailored.

In their motion for summary judgment, the defendants assert that the plaintiff lacks standing to challenge many of the ordinance's provisions, that the ordinance is not vague because the definitions contained in §12.24 are reasonably specific and precise, and that the definitions and provisions challenged by the plaintiff are not overbroad. The defendants further maintain that § 12.24 passes intermediate scrutiny, that the plaintiff's facial and as applied challenges to the ordinance's frequency of presentation requirement should be rejected. Finally, the defendants assert that to the extent the court finds any portions of the ordinance invalid, the ordinance's severability clause saves the remaining provisions.

In response, the plaintiff asserts that he has standing to challenge the ordinance's constitutionality, the definition of adult cabaret is vague on its face and as applied to the plaintiff, the definition of adult cabaret is overbroad, and the ordinance cannot be saved by severance. The plaintiff also maintains that the ordinance does not meet the standards required of a time, place, and manner regulation of adult expression. Finally, the plaintiff asserts that the police action on April 8, 2006 was unconstitutional.

**Subject Matter Jurisdiction**

Under Article III of the Constitution, the federal judicial power extends only to "cases" or "controversies." U.S. Const. art. III. The "case or controversy" requirement ensures that federal courts will hear only justiciable or live cases. <u>Smith v. Wisconsin Dep't of Agric.</u>, 23

- 26 -

F.3d 1134, 1141 (7th Cir. 1994). The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." Northeastern Fla. Contractors v. Jacksonville, 508 U.S. 656, 663 (1993) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555 [1992]).

The mootness doctrine, on the other hand, requires that the case remain live throughout the pendency of the action. Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990). The mere voluntary cessation of allegedly illegal conduct does not moot a case. United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953). However, a case does cease to be a live controversy if the recurrence of the challenged conduct is only a speculative contingency. Hall v. Beals, 396 U.S. 45, 49 (1969); see also, Super Tire Engineering Co., v. McCorkle, 416 U.S. 115, 122 (1974).

**Mootness**

The plaintiff asserts that the § 12.24(2)(b) is facially vague for two reasons. First, the ordinance applies only to establishments that "regularly, commonly, habitually, or consistently" feature various forms of entertainment. Because the ordinance does not define "regularly, commonly, habitually, or consistently," the plaintiff asserts that such phrase is vague. Second, one of the forms of entertainment that require regulation is the "exotic or erotic dancing or performances that are intended for the sexual interests or titillation of an audience of customers." The plaintiff states that such phrase also is not defined by the ordinance and is vague.

In response, the defendant points out that the Village amended § 12.24 on November 20, 2006, and that the amended ordinance does not include either the phrase "regularly, commonly, habitually, or consistently" or any reference to exotic or erotic dancing or

- 27 -

performances intended for the sexual interests or titillation of an audience or customers.[3]  The defendants assert that because the current ordinance has removed these provisions, the plaintiff's vagueness challenge to § 12.24 is moot.

Under Article III of the Constitution, "cases that do not involve 'actual, ongoing controversies' are moot and must be dismissed for lack of jurisdiction." <u>Federation of Adver. Indus. Representatives, Inc. v. City of Chicago</u>, 326 F.3d 924, 929 (7th Cir. 2003). "A question of mootness arises when . . . a challenged ordinance is repealed during the pendency of litigation and a plaintiff seeks only <u>prospective</u> relief." <u>Id.</u> (emphasis added).  A defendant's change in conduct does not moot a case, however, when the plaintiff makes a claim for damages.  <u>Id.</u> (citing <u>Buckhannon Board & Care Home, Inc. v. W. Va. Dep't. of Health and Human Res.</u>, 532 U.S. 598, 608-09 [2001]).

In this case, the plaintiff seeks not only declaratory and injunctive relief, but also compensatory damages for the loss he suffered as a result of the defendants' alleged unconstitutional restrictions on his freedom of expression and loss of profits.  Thus, the plaintiff does not seek only prospective relief and, therefore, his vagueness challenge to § 12.24 is not rendered moot by the revised ordinance.  Accordingly, the portion of the defendants' motion seeking dismissal of the plaintiff's vagueness challenge to §12.24 based on mootness will be denied.

_____

[3]The revised ordinance amended the definition of "adult cabaret" in §12.24(2)(b) by deleting the reference to exotic or erotic dancing or performances intended for the sexual interests or titillation of an audience or customers.

- 28 -

**Standing**

In their motion for summary judgment, the defendants assert that the plaintiff lacks standing to challenge many ordinance provisions. In addition, the defendants maintain that the plaintiff lacks standing with respect to his vagueness challenge to the term, "adult cabaret."

Standing focuses not on the claim itself but on the party challenging the ordinance. To establish standing a party must demonstrate three things: (1) "injury in fact," which means an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. Northeastern Fla. Contractors, 508 U.S. at 663-64. (citations omitted).

"It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990) (citations omitted). The party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts "demonstrating that he is a proper party to invoke judicial resolution of the dispute." Id. (quoting Warth v. Seldin, 422 U.S. 490, 518 [1975]).

The defendants assert that the plaintiff lacks standing with respect to the following provisions: (1) provisions relating to dissimilar sexually oriented businesses (like adult bookstores, motels, and theaters); (2) expiration, suspension or revocation of licenses; (3) disclosure requirements of corporate shareholders or other corporate representative; (4) disqualification provisions when the applicant has been convicted of specified past criminal acts; and (5) age requirements. In response, the plaintiff states that he has not and will not challenge any of those provisions. Because the plaintiff does not challenge any of the

- 29 -

ordinance provisions for which the defendants assert that he lacks standing, whether the plaintiff has standing on those issues or not is immaterial and need not be addressed.

With respect to the defendants' contention that the plaintiff lacks standing regarding his vagueness challenge to the term, "adult cabaret," the defendants rely on Genusa v. City of Peoria, 619 F.2d 1203 (7th Cir. 1980), to support their assertion. In Genusa, the plaintiffs, who operated adult bookstores, acknowledged that the bookstores were within the scope of the definition of "adult bookstore" found in the ordinance. 619 F.3d at 1209. The court concluded, therefore, that "[t]he definition is thus sufficiently precise to leave plaintiffs in no doubt about whether their actions are covered." Genusa, 619 F.3d at 1209.

The defendants maintain that the plaintiff "has acknowledged that he seeks to operate as a sexually oriented business, specifically an adult cabaret" and, therefore, "he thus understands those definitional terms under § 12.24 as applicable to his business." (Village of Germantown, Thomas Schreihart and Michael Snow's Brief in Support of Motion for Summary Judgment [Defendants' Brief] at 3). In response, the plaintiff asserts that unlike the plaintiffs in Genusa, he was not operating an adult business that fell squarely within the core of the definition. Rather, the plaintiff maintains that he sought to present as much adult expression as he lawfully could before it would trigger regulation under the ordinance.

The facts of this case are clearly distinguishable from the facts in Genusa. The plaintiffs in Genusa were, at the time the "adult use" ordinance was enacted, owners or employees of adult bookstores. The plaintiffs, who conceded that the bookstores were "adult bookstores" within the meaning of the ordinance, challenged the ordinance only with regard to its regulation of adult bookstores.

- 30 -

In contrast, the plaintiff in this case was not operating an "adult cabaret," but sought and continues to seek to present nude or semi-nude dance entertainment as often as he is legally permitted to do so. Prior to the repeal of § 12.02(7)(i), he determined that he was not legally permitted to present nude or semi-nude dance entertainment at all. However, after the repeal of § 12.02(7)(i), based on his attorney's advice, he determined that he could present nude or semi-nude dance entertainment occasionally. The fact that the plaintiff seeks to present nude or semi-nude dance entertainment as often as he is legally permitted to do so and has on one occasion attempted to present such entertainment does not affect his standing to challenge § 12.24. The plaintiff has not conceded that he is operating or seeks to operate an "adult cabaret," but only that he seeks to present nude or semi-nude dancing as often as he legally allowed.

The defendants also assert that the plaintiff lacks standing to challenge § 12.24 based on their assertion that any ruling on the unconstitutionality of the definition of "adult cabaret" or the operational provisions of § 12.24 would not redress the plaintiff's alleged inability to operate under § 12.24(13)'s location requirements. The plaintiff agrees that if the ordinance is found to be constitutional in its entirety, then he will not be eligible to become licensed as a sexually oriented business on the property he owns because he is located less than 1500 feet from a residence. The plaintiff asserts, however, that if the court clarifies or narrows the definition of adult cabaret, then he would be able to present nude dance entertainment on an occasional or intermittent basis without being a sexually oriented business as that term is defined by the ordinance.

The court agrees with the plaintiff that he has standing to challenge § 12.24 regardless of his inability to operate under § 12.24(13)'s location requirements. The ordinance's location

requirements, unlike, for example, a separate zoning code, would be directly affected by a finding that §12.24 is unconstitutional. Therefore, the defendants' motion for summary judgment will be denied with respect to their assertion that the plaintiff lacks standing to challenge § 12.24.

## Constitutionality of the Ordinance

The Free Speech Clause of the First Amendment made applicable to states and municipalities through the Fourteenth Amendment, Fiske v. Kansas, 274 U.S. 380, 71 L. Ed. 1108, 47 S. Ct. 655 (1927), provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. Erotic dancing is expressive conduct entitled to protection under the First Amendment. City of Erie v. Pap's A.M., 529 U.S. 277 (2000). Erotic dancing is not "high artistic expression." Schultz v. City of Cumberland, 228 F.3d 831, 839 (7th Cir. 2000). However, "'nude barroom dancing, though lacking in artistic value, and expressing ideas and emotions different from those of more mainstream dances, communicates them, to some degree, nonetheless.'" Id. (quoting Miller v. Civil City of South Bend, 904 F.2d 1081, 1087 [7th Cir. 1990], rev'd sub nom. on other grounds, Barnes v. Glen Theatre, Inc., 501 U.S. 560 [1991]). The Supreme Court explained that "nude dancing . . . is expressive conduct, although . . . it falls only within the outer ambit of the First Amendment's protection." Erie, 529 U.S. at 288.

The parties initially address the plaintiff's facial overbreath and vagueness challenges and later address whether the ordinance meets the requirements of time, place and manner regulation of expression. However, if the ordinance is not a constitutional time, place or manner restriction, the court need not address whether it is facially vague or overbroad. See Schultz, 228 F.3d at 848. Thus, the court will first address the parties' assertion with respect

- 32 -

to whether the ordinance is a constitutional time, place and manner restriction and then address their assertion with respect to whether the ordinance is facially overbroad or vague.[4]

**Time, Place, Manner**

The plaintiff asserts that the ordinance does not meet the requirements of time, place and manner regulation of expression. Specifically, the plaintiff maintains that the ordinance, taken in conjunction with the zoning code, does not allow adequate alternative avenues of expression and that the ordinance is not narrowly tailored. In response, the defendants assert that the ordinance passes intermediate scrutiny review because the location restrictions leave open sufficient alternative sites for adult businesses and the hours of operation are narrowly tailored.

It is well established that regulations designed to restrain speech on the basis of its content are subject to strict scrutiny and are presumptively invalid under the First Amendment. Schultz, 228 F.3d at 840 (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 382 [1992]; City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 47 [1986] and Stromberg v. California, 283 U.S. 359, 368-69 [1931]). "Content-based regulations 'by their terms distinguish favored speech from disfavored speech on the basis of the ideas expressed.'" Schultz, 228 F.3d at 840. "In contrast, content-neutral regulations are justified without reference to the content of the regulated speech and do not raise the specter of government discrimination." Id. Thus, "a general prohibition on all public nudity receives intermediate scrutiny, rather than strict

---

[4]The court acknowledges, however, that "the approach chosen may have no real effect on the outcome of this case." Hodgkins v. Peterson, 355 F.3d 1048, 1057 (7th Cir. 2004) (explaining that the O'Brien [United States v. O'Brien, 391 U.S. 367 (1968)] analysis and the time, place and manner analysis are really just "variations on the same principal."); But see, Schmitty's City Nightmare, LLC v. City of Fond Du Lac, 391 F. Supp. 2d 745, 753 (E.D. Wis. 2005) (concluding that overbreath analysis involves a more stringent standard than the Renton time, manner, place framework).

scrutiny, when the government offers as its legislative justification the suppression of public nudity's secondary effects." Id. at 841.

In this case, the ordinance requires that anyone who operates a "sexually oriented business" must obtain an operator's license from the Village. A sexually oriented business includes, as is relevant here, an adult cabaret. The ordinance at issue defines adult cabaret as "a nightclub, bar, restaurant, café, or similar commercial establishment that regularly, commonly, habitually, or consistently features:

> 1. persons who appear in a state of nudity or seminudity; or
> 2. live performances that are characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities'; or
> 3. films, motion pictures, video cassettes, slides, photographic reproductions, or other image producing devices that are characterized by the depiction or description of 'specified anatomical areas' or 'specified sexual activities'; or
> 4. persons who engage in 'exotic' or erotic dancing or performances that are intended for the sexual interests or titillation of an audience or customers.

Ordinance §12.24(2)(b). The ordinance thus targets expression based upon its content. "Because it treats erotic expression differently than other expression, it is content-based." Wil-Kar, Inc. v. Germantown, 153 F. Supp. 2d 982, 988 (E.D. Wis. 2001) (citing Schultz, 228 F.3d at 843).

Nonetheless, there is an exception to the general rule that strict scrutiny applies to content-based regulations. Schultz, 228 F.3d at 843; DiMa Corp. v. Town of Hallie, 185 F.3d 823, 828 (7th Cir. 1999). Some time, place or manner regulations are treated as content-neutral, even though they are content-based. See Schultz, 228 F.3d at 845. Time, place, or manner restrictions are those that government uses to direct speech through certain avenues rather than others. Id. Content-based time, place or manner regulations are subject only to intermediate scrutiny if they "are *justified* without reference to the content of the regulated

- 34 -

speech." City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 48 (1986). "Such justification is present if the regulation's predominant concern is with the 'secondary effects' of the regulated speech, rather than with the content of that speech." Id. at 47; see also, Andy's Rest. & Lounge, Inc. v. City of Gary, 466 F.3d 550, 555 (7th Cir. 2006) (Such justification is present "when the 'municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance.'" [quoting R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 408 (7th Cir. 2004)]).

"In evaluating the sufficiency of this connection, courts must 'examine evidence concerning regulated speech and secondary effects.'" Andy's Rest & Lounge, 466 F.3d at 555 (quoting R.V.S., 361 F.3d at 408). Adverse secondary effects connected with adult entertainment include increased crime, decreased property values, prostitution, illicit sex, sexually transmitted disease and urban blight. City of Renton, 475 U.S. at 48; Schultz, 228 F.3d at 847.

Accordingly, in the domain of adult entertainment, discriminatory time, place or manner restrictions can be upheld as if they were content-neutral restrictions on adult entertainment if they (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest in curbing adverse secondary effects; and (3) still leave open ample alternative channels for communication. City of Renton 475 U.S. at 47; Schultz, 228 F.3d at 845. The court of appeals for this circuit has explained that "a content-discriminatory regulation of time, place or manner is constitutional only if it preserves 'reasonable opportunity' to disseminate the speech at issue.'" Schultz, 228 F.3d at 846 (quoting North Ave. Novelties v. City of Chicago, 88 F.3d 441, 445 [7th Cir. 1996]). Thus, "only the provisions of the Ordinance that regulate the time, place or manner of adult

- 35 -

entertainment without removing alternative channels of communication are reasonable under the First Amendment." Schultz, 228 F.3d at 846.

In this case, the ordinance's preamble states that its intention was to regulate the harmful secondary effects of sexually oriented businesses without suppressing any speech activities protected by the First Amendment. In enacting § 12.24, the Village assembled an extensive legislative record to support the regulation of sexually oriented businesses. The record contained studies, court decisions, ordinances from other cities, and other materials all supporting the Village's rationale that sexually oriented businesses should be regulated to reduce harmful secondary effects. The legislative record also contained the findings of several published court decisions as evidence supporting the amendment of the ordinance.

The Village of Germantown considered surveillance reports pertaining to the incidence of AIDS, HIV and other sexually transmitted diseases issued by the Center for Disease Control and related Wisconsin agencies when enacting § 12.24. Additionally, the Village Board considered many facts and figures pertaining to pornography as it relates to the economy, children and rape and reviewed several articles and publications on the subject of the secondary effects of sexually oriented businesses. Other materials were also considered by the Village Board when it enacted § 12.24.

The court of appeals for this circuit recently concluded that similar evidence relied upon by the City of Gary, Indiana was "more than adequate to establish the secondary effects regulated by the Ordinance." Andy's Rest. & Lounge, 466 F.3d at 555. The court reiterated that a City may rely on previous judicial opinions when evaluating secondary effects the city wants to regulate. Id.; City of Renton, 475 U.S. at 51-52 (A city may rely upon previous judicial opinions evaluating secondary effects and need not conduct new studies or produce

- 36 -

evidence independent of that already generated by other cities, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

In the instant case, the evidence relied upon by the Village adequately establishes the secondary effects regulated by the ordinance. Thus, the ordinance was justified without reference to the content of the regulated speech. See Renton, 475 U.S. at 47; Schultz, 228 F. 3d at 845.

The plaintiff asserts, however, that sections of the ordinance are not narrowly tailored to serve a substantial government interest because they are overbroad, i.e., they regulate businesses that offer erotic dancing that have not been shown to generate negative secondary effects.[5] As will be addressed here, the plaintiff asserts that the ordinance requires too much clothing and improperly impinges on dance moves. Specifically, the plaintiff asserts that under § 12.24(2)(n) a performer is "nude" even when dressed in a bathing suit bottom cut high on the thigh because her bare buttock is exposed to view. He also asserts that a performer dressed in a bathing suit whose buttocks show or one dressed in an evening gown with decolletage that permits a glimpse of the breast below the top of the areola would be regulated pursuant to § 12.24(2)(b)2.

The plaintiff further asserts that the inclusion of fondling, erotic touching, simulated intercourse or simulated masturbation in the definition of "specified sexual activities" interferes with the dancer's moves and presentation of her message and does not ameliorate adverse

---

[5]Not all of the sections of the ordinance that the plaintiff asserts are overbroad will be addressed here. Only the plaintiff's assertions that the ordinance is overbroad in the it requires too much clothing and improperly impinges on dance moves will be addressed in this section. The plaintiff's remaining overbreadth arguments will be analyzed as to whether the ordinance is overbroad.

- 37 -

secondary effects. Additionally, the plaintiff asserts that the hours restrictions in the ordinance are not narrowly tailored to serve a substantial governmental interest.

In response, the defendants assert that the definitions of "nudity," "specified anatomical area" and "specified sexual activities" are not overbroad and, therefore, are narrowly tailored. The defendants cite to Schmitty's v. City of Fond du Lac, 391 F. Supp.2d 745 (E.D. Wis. 2005), in support of their assertions. Finally, the defendant maintains that the hours of operation requirement is narrowly tailored to serve a substantial governmental interest.

As is relevant here, the ordinance defines an adult cabaret as "a nightclub, bar, restaurant, café, or similar commercial establishment that regularly, commonly, habitually, or consistently features" "persons who appear in a state of 'nudity' or 'seminudity' or" "live performances that are characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities.'" Ordinance, §12.24(2)(b)(1) and (2). "Nudity" is defined in the ordinance as:

> the appearance of a human bare buttock, anus, anal cleft or cleavage, pubic area, male genitals, female genitals, or vulva, with less than a fully opaque covering; or a female breast with less than a fully opaque covering of any part of the areola; or human male genitals in a discernibly turgid state even if completely and opaquely covered.

§12.24(2)(n). The phrase, "specified anatomical areas," is defined to include:

> 1. the human male genitals in a discernibly turgid state even if completely and opaquely covered;
> 2. less than completely and opaquely covered human genitals, pubic region, buttocks, or a female breast below a point immediately above the top of the areola.

§ 12.24(2)(t). The phrase, "specified sexual activities," is defined as:

> 1. the fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breasts, whether covered or uncovered;
> 2. sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation or sodomy;

- 38 -

3. masturbation, actual or simulated; or
4. excretory functions as part of or in connection with any of the activities set forth . . . above.

§12.24(2)(v).

In <u>Schmitty's</u>, relied on by the defendants, "specified anatomical areas" were defined as "less than completely and opaquely covered human genitals, human buttocks and human female breast below a point immediately above the top of the areola; and human male genitals in a discernibly turgid state, even if completely and opaquely covered." 391 F. Supp.2d at 753-54. United States District Court Judge William C. Griesbach read the language so that the phrase "less than completely and opaquely covered" applied only to the phrase "human genitals" and not to the "human buttocks" or "the specified part of the human breasts." <u>Id.</u> at 754. The court concluded that if so construed,

> the ordinance would only apply to entertainment in which the human genitals would be displayed with less than a complete and opaque covering, or the human buttocks or the human female breast below a point immediately above the top of the areola were completely, or almost completely, displayed. The ordinance would also cover entertainment in which the male genitals were in a "discernibly turgid state," even if they were completely and opaquely covered.

391 F.Supp.2d at 754-55. The court held that "[c]onstrued this way, the entertainment covered by the regulation is limited to the kind that has been shown to produce the types of harmful secondary effects that have been found sufficient to justify the limitations created by it." <u>Id.</u> at 755.

In so holding, Judge Griesbach was cognizant of the fact that "a virtually identical ordinance" was discussed by United States District Court Judge Lynn Adelman in <u>MDK, Inc. v, Village of Grafton</u>, 345 F.Supp.2d 952 (E.D. Wis. 2004). In that case, Judge Adelman found that the provisions of the ordinance relating to adult cabarets:

- 39 -

go well beyond regulating businesses in which dancers wear pasties and G-strings. In fact, such provisions regulate establishments that regularly feature dancers whose buttocks are almost entirely covered -- in the words of the ordinance, "less than completely and opaquely covered" -- and whose breasts are mostly covered -- in the words of the ordinance, covered "below . . . the top of the areola." § 9.35.020(w)(2). A G-string would not cover all of the buttocks. Nor would the bottom of a bikini bathing suit. In fact, only the most conservative of bathing suit bottoms would cover all of the buttocks. Further, pasties would not cover all of the breast below the top of the areola. Nor would a substantial number of bikini tops. Thus, the effect of Ch. 9.35 is to regulate establishments in which dancers wear two-piece bathing suits with conservative bottoms and tops that cover much of their breasts.

MDK, 345 F.Supp.2d at 958.

Judge Griesbach agreed with Judge Adelman's conclusion that an ordinance which regulated dancers wearing "'two-piece bathing suits with conservative bottoms and tops that covered much of their breasts' would be unconstitutionally overbroad since it would regulate expressive conduct not associated with the harmful secondary effects from which the city was entitled to protect the community." Schmitty's, 391 F.Supp.2d at 754. Judge Griesbach disagreed, however, with Judge Adelman's conclusion that the language of the ordinance had to be so read. Rather, Judge Griesbach stated that the definition of "specified anatomical areas" could be read so that the phrase "less than completely and opaquely covered" "applies only to the first part, the 'human genitals,' and not to the 'human buttocks' and the specified part of female breast." Schmitty's, 391 F.Supp.2d at 754-55.

In this case, the defendants assert that the definition of "specified anatomical areas" in § 12.24(2)(t) is virtually indistinguishable from the definition used in the Fond du Lac ordinance and upheld in Schmitty's. See 391 F.Supp.2d at 753-54. The defendants urge the court to read the definition of "specified anatomical areas" as Judge Griesbach read it so that "less than completely and opaquely covered" modifies only the "human genitals."

- 40 -

The definition of "specified anatomical areas" in this case is slightly different than the definition in the Schmitty's case. For one, the definition in Schmitty's did not include the "pubic region" as the definition does in this case. Additionally, the definition used an "and" whereas the definition in this case uses an "or." See Schmitty's, 391 F.Supp.2d at 754. However, the definition of "specified anatomical areas" in MDK is exactly the same as the definition of "specified anatomical areas" in this case. See MDK, 345 F.Supp.2d at 954.

In this case, the court finds that given the grammatical structure and phrasing of § 12.24(2)(t) it is most properly construed so that the phrase "less than completely and opaquely covered" modifies all of the described parts which follow it. Thus, the definition of "specified anatomical areas," would apply to a performer dressed in a bathing suit whose buttocks show. Additionally, the definition would apply to a performer dressed in an evening gown that permitted a glimpse of the breast below the areola as the definition does not exempt the appearance of the female breast visible from cleavage exhibited by a dress, blouse, shirt, leotard, bathing suit or other wearing apparel. Like the defendant in MDK, Inc., the defendants in this case have "not shown that establishments in which dancers wear bathing suits generate negative secondary effects." See 345 F.Supp.2d at 958. Accordingly, § 12.24(2)(t) regulates businesses that have not been shown to generate negative secondary effects and, therefore, is not narrowly tailored.

The defendants also assert that §§ 12.24(2)(b)1 and (2)(n) can be constructed in a manner similar to the court's interpretation of the Fond du Lac ordinance in Schmitty's and if

- 41 -

constructed in that manner, the provisions are narrowly tailored.[6]  The defendants assert that § 12.24(2)(n) "could be read so that the phrase 'with less than a fully opaque covering' applies only to the 'vulva.'" (Defendant's Response to Plaintiff's Motion for Summary Judgment [Defendant's Response Brief] at 11).

In this case, the court concludes that the language of the ordinance can only be read so that the phrase "with less than a fully opaque covering" applies to all of the nouns preceding it, i.e., the human bare buttock, anus, anal cleft or cleavage, pubic area, male genitals, female genitals, and vulva.  Moreover, even if the phrase "with less than a fully opaque covering" modifies only the vulva, it would still regulate performers with a "bare buttock."  Thus, it would apply to performers wearing a G-string, a bikini swim suit, a thong swim suit, or a one-piece bathing suit cut high on the thigh.  Accordingly, §§ 12.24(2)(b)1 and 12.24(n) regulate businesses that have not been shown to generate negative secondary effects and, therefore, are not narrowly tailored.

Finally, with respect to the plaintiff's assertion that the definition of "specified sexual activities" is overbroad the defendants again rely on Schmitty's.  The defendants assert that the first three subsections of § 12.24(2)(v) are similar to the definition of "specified sexual activities" which was upheld in Schmitty's.

The ordinance in Schmitty's regulated adult entertainment and cabarets that featured "specified sexual activities," which were defined as:

> Human genitals in a simulated or actual state of sexual stimulation or arousal; acts of sexual intercourse, masturbation, sodomy, bestiality, necrophilia,

---

[6]The court notes that the court analyzed the ordinance Schmitty's only as to whether it was overbroad. The court further notes that the ordinance in Schmitty's, unlike the ordinance in this case, was a zoning ordinance. See R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 414 (7th Cir. 2004) ("As a zoning regulation, the ordinance is viewed as less restrictive than an outright ban.").

- 42 -

sadomasochistic abuse, fellatio or cunnilingus; fondling or other erotic touching or sexual stimulation of human genitals, pubic region, buttocks, or female breast.

391 F.Supp.2d 745 at 758. The plaintiff challenged the regulation of "fondling or other erotic touching." In finding that the ordinance's regulation of erotic touching and fondling was not overbroad, the court in Schmitty's distinguished the ordinance in Schultz, stating that it operated as a total ban on activity rather than a zoning of the activity. The court further stated that the court in Schultz did not address the "specified sexual activities" definition on overbreadth grounds and "the standard, therefore, was much lower." 391 F.Supp.2d at 759.

This case cannot be so distinguished from Schultz. Section 12.24, unlike the ordinance in Schmitty's, is not a zoning ordinance. Additionally, this court is addressing the "specified sexual activities" definition not on overbreadth grounds, but as a time, place and manner restriction. See also, R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 413 (7th Cir. 2004) (In finding the ordinance not narrowing tailored, the court stated: "As a zoning regulation we view the Ordinance as less restrictive than an outright ban; however, it is still the case that to avoid the Ordinance dancers must not convey an erotic message through their movements.").

In Schultz, a licensing and regulatory system for all "sexually oriented businesses" prohibited "the performance of a strikingly wide array of sexually explicit dance movements, or what the Ordinance misdenominates as 'specified sexual activities' including 'the fondling or erotic touching of human genitals, pubic region, buttocks, anus, or female breasts.'" 228 F.3d at 847. The court stated that "[t]he dominant theme of nude dance is "'an emotional one; it is one of eroticism and sensuality.'" Id. (quoting Miller, 904 F.2d at 1086-87). The court then concluded that the ordinance's definition of "specified sexual activities" "deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual

- 43 -

performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. It interdicts the two key tools of expression in this context that imbue erotic dance with its sexual and erotic character--sexually explicit dance movements and nudity." Schultz, 228 F.3d at 847.

In this case, the ordinance's definition of "specified sexual activities" includes, like the ordinance in Schultz, the "fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breasts." Thus, like the definition in Schultz, § 12.24(2)(v) "does much more than inhibit 'that portion of the expression that occurs when the last stitch is dropped.'" See Schultz, 228 F.3d at 847 (citation omitted). It "constrains the precise movements that the dancer can express while performing." Id. Accordingly, the court concludes that § 12.24(2)(v) is not narrowly tailored to serve the defendant Village's significant interest in curbing secondary effects.

In addition to asserting that the ordinance regulates businesses that offer erotic dancing that have not been shown to generate negative secondary effects and, therefore, is not narrowly tailored to serve a substantial government interest, the plaintiff also asserts that the hours regulation, § 12.24(24), is not narrowly tailored. The plaintiff in Andy's Rest. & Lounge, challenged the hours regulation of the City of Gary's "sexually oriented business" ordinance. The ordinance restricted the operating hours of a sexually oriented business to 10:00 a.m. to 11:00 p.m., seven days a week. The court noted that it had previously affirmed an hours regulation similar to that imposed by the ordinance in Schultz. Andy's Rest. & Lounge, 466 F.3d at 555. The hours regulation in Schultz limited the business hours for sexually oriented businesses to between 10 a.m. and midnight, Monday through Saturday. Thus, the court,

- 44 -

relying on its precedent and "the City's substantial evidentiary record," upheld the hours regulation. Andy's Rest. & Lounge, 466 F.3d at 556.

In this case, the ordinance restricts the operating hours of a sexually oriented business to between 9:00 a.m. and 10:00 p.m., seven days a week. As the court concluded in Schultz and Andy's Rest. & Lounge, the hours regulation serves a substantial government interest. The plaintiff maintains that the hours regulation is not sufficiently narrow, asserting that the "required early closing time for sexually oriented businesses effectively keeps an adult cabaret from reaching its intended audience, comprised of people who usually go out later at night." (Brief in Support of Plaintiff's Motion for Summary Judgment as to Liability on all First Amendment Claims [Plaintiff's Brief] at 44).

In Andy's Rest. & Lounge, the court upheld the hours restriction as narrowly tailored, simply concluding: "We have previously held that similar hour restrictions . . . are narrowly tailored, and we stick to those rulings here." 466 F.3d at 556; see also, Schultz, 228 F.3d at 846 ("Although Section X provides fewer hours of operation than the ordinance in *DiMa*,[7] we find that the restriction is not 'substantially broader than necessary,' even if more restrictive than absolutely necessary or justified." [quoting Ward v. Rock Against Racism, 491 U.S. 781, 800 (1989)]). Accordingly, based on these precedents and the City's extensive evidentiary record, this court concludes that the hours of operation restriction at issue in this case is narrowly tailored.

Finally, the plaintiff maintains that the ordinance's location restrictions, § 12.24(13), along with the relevant portions of the zoning code, unreasonably limit alternative avenues of

---

[7]DiMa Corp. v. Town of Hallier, 185 F.3d 823 (7th Cir. 1999).

- 45 -

communication. The defendants assert that the ordinance leaves open adequate alternative avenues of communication in that two sites, known as Sites 22A and 22B, were available to the plaintiff to operate a sexually oriented business.

Whether adequate avenues of communication are left open is a question that is answered through an analysis of how much land is available in which adult businesses may be located. Renton, 475 U.S. at 53-4. "The constitution does not mandate that any minimum percentage of land be made available for certain types of speech. What it does require is that zoning schemes that regulate the location of speech provide a 'reasonable opportunity' to disseminate the speech at issue." North Ave. Novelties, Inc. v. City of Chicago, 88 F.3d 441, 445 (7th Cir. 1996) (citing Renton, 475 U.S. at 52). The focus is on the ability of providers as a group to provide this type of expression and on the ability of the public as a whole to receive it. North Ave. Novelties, 88 F.3d at 444.

The ordinance requires that a sexually oriented business may locate only in a commercial zoning district. § 12.24(13). The ordinance also provides that a sexually oriented business may not locate within 1500 feet of a building used primarily for religious worship, an educational facility, public park or recreation area, or the property line of a lot zoned for residential use, or within 1500 feet of another sexually oriented business. § 12.24(13)(a).

When asked to identify all sites where an adult business could lawfully locate, the defendants produced a list of 142 parcels of property. Of these 142 proposed sites, 138 are in zoning districts that are not zoned commercial and a sexually oriented business cannot locate as a permitted use on any of these sites. Additionally, two of the remaining four sites, Sites 34A and 36A, are located in the B-4 Professional Office District which is commercial, but limited and a sexually oriented business cannot locate as a permitted use in the B-4 district.

- 46 -

Two sites of the 142 are in a commercial zone in which a sexually oriented business could locate as a permitted use, Sites 22A and 22B. They are located in the B-5 zoning district. The plaintiff maintains, however, that both of these sites are located less than 1500 feet from property where a private educational facility, La Fleurs Gymnastic Academy, is being built and, therefore, a sexually oriented business cannot locate on either of those sites. Thus, the plaintiff asserts that no sites are available within the Village where a sexually oriented business can locate. The defendants maintain, however, that the two sites, Sites 22A and 22B, are available because La Fleurs Gymnastic Academy is not an educational facility within the meaning of the ordinance.

Section 12.24(13)(a)(2) provides that

(a) the sexually oriented business may not be operated within:

> 2.      1500 feet of public or private educational facility including but not limited to child day care facilities, nursery schools, preschools, kindergartens, elementary schools, private schools, intermediate schools, junior high schools, middle schools, high schools, vocational schools, secondary schools, continuation schools, special education school, junior colleges, and universities; school includes the school ground, but does not include the facilities used primarily for another purpose and only incidentally as a school.

Thus, the description of educational facilities specifically excludes "facilities used primarily for another purpose and only incidentally as a school." The La Fleurs Gymnastic Academy will be "used primarily for another purpose" and, therefore is not an educational facility.

Accordingly, a sexually oriented business could be located on either Sites 22A or 22B. At the same time, no adult businesses exist or have sought to operate in the Village. Thus, the supply of available land exceeds the demand; the ordinance's location restrictions,

- 47 -

§ 12.24(13), along with the relevant portions of the zoning code did not unreasonably limit alternative avenues of communication.[8]  See North Ave. Novelties, 88 F.3d at 444.

**Overbreadth**

In addition to asserting that § 12.24 was an unconstitutional time, place or manner restriction, the plaintiff maintains that §12.24 is facially overbroad.  The court of appeals for this circuit explained the overbreadth doctrine:

> The overbreadth doctrine prevents the government from casting a net so wide that its regulation impermissibly burdens speech. To avoid chilling the speech of third parties who may be unwilling or unlikely to raise a challenge in their own stead, the overbreadth doctrine in certain circumstances permits litigants already before the court to challenge a regulation on its face and raise the rights of third parties whose protected expression is prohibited or substantially burdened by the regulation. See Broadrick v. Oklahoma, 413 U.S. 601, 613, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973).

Schultz, 228 F.3d at 848.

A facial overbreadth challenge is successful when it establishes "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court."  Id. (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 [1984]).  However, overbreadth is "manifestly, strong medicine." Broadrick, 413 U.S. at 613.  Thus, the Supreme Court "has invalidated regulations only when a limiting construction is not readily available and the unconstitutional applications of the regulation are real and substantial in relation to the regulation's plainly legitimate sweep." Schultz, 228 F.3d at 848 (citing Forsyth County v. Nationalist Movement, 505 U.S. 123 [1992]; Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569 [1987];

---

[8]The court also notes that the revised ordinance opens up an additional 43 sites in commercial and industrial zones at which a sexually oriented business may operate.

- 48 -

Brockett v. Spokane Arcades, 472 U.S. 491 [1985]; Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 [1980]).

When a plaintiff argues on behalf of third parties who wish to engage in protected speech but who are deterred by what the plaintiff regards as the ordinance's "real and substantial threat of overbreadth," "the overbreadth doctrine guards against the suppression of protected speech unconnected to the negative secondary effects cited as legislative justification." Schultz, 228 F.3d at 849. "Thus, an enactment that purports to be aimed at secondary effects, but which also covers a substantial amount of expressive activity that cannot plausibly be believed to cause such effects, will be invalidated as overbroad." Clarkson v. Town of Florence, 198 F. Supp.2d 997, 1011-12 (E.D. Wis. 2002) (citing Schultz, 228 F.3d at 849).

The plaintiff first asserts that §12.24 is overbroad because: (1) it contains no exception for infrequent performances; (2) it requires too much clothing; (3) it impinges on dance moves; (4) it covers too many places; and (5) it regulates even establishments where dancers are fully clothed. The plaintiff also asserts that the exemptions set forth in §12.24(25) are inadequate to save the ordinance from an overbreadth challenge. The court has already addressed the plaintiff's assertions that the ordinance requires too much clothing and impinges on dance moves when determining whether the ordinance was a constitutional time, place and manner restriction.

As noted, the ordinance defines an "adult cabaret" as "a nightclub, bar, restaurant, café, or similar commercial establishment that regularly, commonly, habitually, or consistently features" certain forms of sexually oriented entertainment. The plaintiff asserts that although "each of these words requires that something be repeated with some frequency, . . . little

- 49 -

frequency is required." (Plaintiff's Brief at 8). Therefore, the plaintiff maintains that "any nightclub, bar, restaurant, café, or similar commercial establishment that permitted even one birthday party with a stripper on an annual basis would be classified as a sexually oriented business, even though such a regular but infrequent event would cause no adverse secondary effects." Id. at 8-9.

The defendants dispute this contention. They assert that "regularly" is a word of common understanding and usage and of sufficient definiteness that ordinary people can understand its meaning.

"[A] facial overbreadth challenge fails when the regulation's plain language is readily susceptible to a narrowing construction that would make it constitutional." Schultz, 228 F.3d at 850. In Schultz, the court of appeals for this circuit held that "regularly features" can be interpreted to mean "always features." Id. Thus, "[u]nder this interpretation, a venue falls within the definitions for adult theater and adult cabaret only if it features nudity, semi-nudity or specified sexual content as the permanent focus of its business and gives special prominence to such content on a permanent basis." Id.

The plaintiff asserts, however, that such a construction is not available in this case because it runs contrary to the intent of the Village, which is prosecuting him under the ordinance for presenting a single nude show. Although the plaintiff is being prosecuted under the ordinance for presenting a single nude show, the plaintiff admits that if the police had not arrived that evening, he would have gone back to his attorney "as often as I could" for advice on whether or not he could put on another show. (Buzdum Dep. at 124). In fact, he would contact his attorney every week to ask whether he could put on another adult entertainment show. Thus, it was the plaintiff's intent to present additional shows.

- 50 -

The ordinance's preamble states that the ordinance is intended to regulate the harmful secondary effects of sexually oriented businesses without suppressing any speech activities protected by the First Amendment. Accordingly, narrowing the construction of "regularly, commonly, habitually, or consistently features" to "always features," does not run contrary to the Village's intent. Thus, in this case, the phrase "regularly, commonly, habitually, or consistently features" can be interpreted to mean "always features" and, therefore, it is not overbroad.[9] Such a narrowing construction also eliminates the alleged overbreadth of the ordinance because, according to the plaintiff, the "ordinance covers too many places."

Narrowing the construction, however, does not affect the alleged overbreadth of the ordinance because it regulates establishments where dancers are fully clothed. The plaintiff maintains that the ordinance would regulate performances by belly dancers in Greek or Arabian restaurants, hula dancers in Hawaiian-themed establishments and Elvis Presley imitators, none of which have been documented as being related to secondary effects.

The defendants assert that "§ 12.24(2)(b)(4), like the other subsections under the definition for 'adult cabaret,' contains language that requires a 'holding forth' to the public precisely as a place where sexual stimulation of the described sort can be obtained." (Defendants' Response Brief at 15). The defendants further assert that such language met with approval in FW/PBS, Inc. v. Dallas, 493 U.S. 215, 260-61 (1990) (Scalia, J., concurring).

The defendants, however, fail to acknowledge that the definition of "adult cabaret" in FW/PBS, Inc., although similar to the definition in this case, did not include a subsection

_____

[9]The court also points out that unlike the ordinance in Schultz, the ordinance at issue here contains an explicit exemption for expression that contains nudity or sexual depiction, but also possesses serious artistic, social or political value. See 12.24(25)(b); see also, Schultz, 228 F.3d 849-850.

- 51 -

similar to § 12.24(2)(b)(4).  In other words, it did not include in its definition of "adult cabaret" establishments that regularly feature "persons who engage in 'exotic' or erotic dancing or performances that are intended for the sexual interests or titillation of an audience or customers."  See Ordinance, §12.24(2)(b). Nothing in this subsection of the definition of "adult cabaret" in this case "suggests a requirement that the business hold itself forth to the public as a place where sexual stimulation of the described sort can be obtained."  See FW/PBS, Inc., 493 U.S. at 260.

Accordingly, §12.24(b)(4) was not narrowly tailored to serve the Village's interests in combating the alleged secondary effects of sexually oriented entertainment.  It would have prohibited speech not associated with secondary effects and, therefore, it is overbroad.

**Vagueness**

In addition to asserting that § 12.24(2)(b) is facially overbroad, the plaintiff also asserts that § 12.24(2)(b) is facially vague.  Specifically, the plaintiff contends that the phrases "regularly, commonly, habitually, or consistently" and "exotic or erotic dancing or performances that are intended for the sexual interest or titillation of an audience of customers" are vague. The plaintiff maintains that the language "is so all encompassing as to be virtually meaningless."  (Plaintiff's Brief at 21).  The defendants contend that neither phrase is vague.

"A law is void for vagueness if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior."  Anderson v. Milwaukee County, 433 F.3d 975, 978 (7th Cir. 2006) (citing Grayned v. City of Rockford, 408 U.S. 104 [1972]).  Nevertheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Ward v. Rock Against Racism,

- 52 -

491 U.S. 781, 794 (1989). The court of appeals for this circuit explained that "[t]o say that precision is a precondition to enforcement is to say that no ordinance regulating speech may stand--a proposition the Supreme Court has rejected over and again." Anderson, 433 F.3d at 978-9.

Because the court already determined that §12.24(2)(b)(4) is unconstitutionally overbroad, it is not necessary to determine whether it is also vague. Thus, the court will only address the parties' arguments with respect to the phrase "regularly, commonly, habitually, or consistently."

"Regularly" means "in a regular, orderly, lawful, or methodical way." Schultz, 228 F.3d at 849. Commonly, habitually, and consistently have similar meanings. A person of ordinary intelligence is not required to guess at the meaning of the phrase "regularly, commonly, habitually, or consistently.. Accordingly, the court finds that the phrase "regularly, commonly, habitually, or consistently" is not unconstitutionally vague. See Schultz, 228 F.3d at 849.

**Licensing Provisions**

The plaintiff asserts that the ordinance is an unconstitutional prior restraint on expression because the ordinance's definitions are vague and overbroad which results in unbridled discretion in Village officials in determining whether a business requires regulation. The plaintiff also asserts that time limits for issuing a license found in § 12.24(5)(d) are illusory and render the ordinance an unconstitutional prior restraint. In addition, he maintains that the Village, in shutting down the show on April 8, 2006, prevented expression and thus imposed a prior restraint. The defendants maintain that the ordinance is not an unconstitutional prior restraint.

- 53 -

The court previously concluded that the definitions at issue were not vague or overbroad and, therefore, the court summarily concludes that the ordinance does not give the Village officials unbridled discretion in determining whether a business requires regulation. Thus, the court will only address the plaintiff's two other assertions.

An ordinance is a prior restraint if it restricts expression before it takes place, rather than imposing penalties on the expression after it occurs. Alexander v. United States, 509 U.S. 544, 550 (1993). "While 'prior restraints are not unconstitutional per se . . . any system of prior restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity.'" FW/PBS, Inc., 493 U.S. at 225 (quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, [1975]). The Supreme Court has identified "two evils that will not be tolerated in such schemes." FW/PBS, Inc., 493 U.S. at 225. "First, a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" Id. at 225-26 (quoting Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757 [1988]). "Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." FW/PBS, Inc., 493 U.S. at 226.

The plaintiff maintains that although there is a reasonable time limit in which the Village should act after receipt of the application, the time limit lacks the requisite certainty because there is no guarantee that it will be met and no language that requires a license to be issued if the Village does not comply with the time period. Specifically, the plaintiff asserts that two

- 54 -

parts of the ordinance, §12.24(5)(d)6[10] and § 12.24(5)(f),[11] contradict each other. The plaintiff asserts that if the premises to be used have not been approved by the planning/zoning department as being in compliance with applicable laws and ordinances, that is one reason for denial of the license. See § 12.24(5)(d)6. Therefore, the plaintiff asserts that a delay in the inspection will lead to a delay in or denial of licensing. The plaintiff further asserts, that a separate section of the ordinance indicates that failure of the department to certify its

---

[10]Section 12.24(5)(d) of the ordinance provides:

If application is made for a sexually oriented business operator's license, the Clerk shall approve or deny issuance of the license within thirty (30) days of receipt of the completed application. The Clerk shall issue a license to an applicant unless it is determined by a preponderance of the evidence that one or more of the following findings is true:
1. An applicant has failed to provide the information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form;
2. An applicant is under the age of eighteen (18) years;
3. An applicant has been denied a license by the Village to operate a sexually oriented business within the preceding twelve (12) months, or whose license to operate a sexually oriented business has been revoked within the preceding twelve (12) months;
4. An applicant is overdue in payment to the Village for taxes, fees, fines, or penalties assessed against or imposed upon him/her in relation to the sexually oriented business for which license is sought, or the property on which the sexually oriented business is located or will be located;
5. An applicant has been convicted of a "specified criminal activity" as defined in Section (2), subsection (22);
6. The premises to be used for the sexually oriented business have not been approved by the building inspection department, and planning/zoning department as being in compliance with applicable laws and ordinances, if such approval is required under other sections of this ordinance;
7. The license fee required under this ordinance has not been paid;
8. An applicant of the proposed establishment is in violation of or is not in compliance with one or more of the provisions of this ordinance.

[11]Section 12.24(5)(f) provides:

If so required under other sections of this ordinance, the building inspection department, and planning/zoning department shall complete their certification that the premises are in compliance or not in compliance within twenty (20) days of receipt of the completed application by the Clerk. The certification shall be promptly presented to the Clerk. Failure of an appropriate department to timely certify its inspection shall not be grounds for refusing to issue a license within the mandatory time period prescribed in subsection D. (See Nightclubs, Inc. v. City of Paducah, 2000 WL 122184 at 5 (6th Cir. 2000); Baby Tam v. City of Las Vegas, 199 F.3d 1111, 1114-15 (9th Cir. 2000)). In the event that Clerk fails to render a decision on the application within the time specified herein, the operator shall be permitted to commence operation of the business. Render v. Dean, 29 F.3d 1495, 1500-01 (11th Cir. 1994), cert. denied, 514 U. S. 1066 (1995).

inspection on time shall not be grounds for refusing to issue a license within the mandatory time limit. See §12.24(5)(f). The plaintiff maintains that these two sections cannot be harmonized. Therefore, according to the plaintiff, "there is a risk that a delay in certifying an inspection could cause a delay in licensing, and it is this risk of delay that . . . [is] unacceptable." (Plaintiff's Brief at 28).

In this case, the ordinance provides: "If application is made for a sexually oriented business operator's license, the Clerk shall approve or deny issuance of the license within thirty (30) days of receipt of the completed application." § 12.24(5)(d). The ordinance further provides that a license will not be issued if "[t]he premises to be used for the sexually oriented business have not been approved by the building inspection department and planning/zoning department as being in compliance with applicable laws and ordinances." § 12.24(5)(d)6. Section 12.24(5)(f) gives the building inspection department and planning/zoning department twenty days from receipt of the completed application by the Clerk to complete their certification that the premises are either in compliance or not in compliance. Section 12.24(5)(f) also provides that "[f]ailure of an appropriate department to timely certify its inspection shall not be grounds for refusing to issue a license within the mandatory time period prescribed in subsection D." In other words, if either department fails to certify its inspection within the 30 days of receipt of the completed application by the Clerk, the license will issue. § 12.24(5)(f). Moreover, if the Clerk fails to render a decision within 30 days, the "operator shall be permitted to commence operation of the business." § 12.24(5)(f).

The plaintiff acknowledges that the time period allotted for the initial decision, 30 days, has been found to be "brief." Moreover, contrary to the plaintiff's assertion, there is no risk that a delay in certifying an inspection could cause a delay in licensing because § 12.24(5)(f)

- 56 -

requires by using the term "shall" that the building inspection department and the planning/zoning department complete their certification within twenty days of receipt of the completed application by the Clerk. In addition, 12.24(5)(f) specifically provides that the operator "shall be permitted to commence operation of the business."

Nonetheless, the plaintiff maintains that this language does not provide that a license will issue upon the Clerk's failure to render a timely decision. The court disagrees. The ordinance provides that a "sexually oriented business" cannot operate without a license. Thus, the operator could not "commence operation of the business" without the issuance of a license. Moreover, the ordinance cites to Render v. Dean, 29 F.3d 1495 (11th Cir. 1994). In Render, the court held that the time limit was illusory because the administrator's failure to comply with the time limit did not necessarily allow the applicant to begin engaging in the expressive activity for which the license is sought. 29 F.3d at 1500-01. The ordinance provided that "in the event the Administrator exceeds the 45-day time limit, 'the applicant may be permitted to begin operating the establishment for which a license is sought.'" Id. In holding that the ordinance failed to impose reasonable time limits on the decisionmaker, the court concluded that because the ordinance provided that "the applicant may be permitted to begin operating," rather than shall be permitted to begin operating, it did not create an absolute right to operate at the expiration of the 45 days. Unlike Render, the ordinance at issue in this case provides that if the Clerk fails to render a decision in 30 days, "the operator shall be permitted to commence operation of the business." § 12.24(5)(f).

Finally, the plaintiff asserts that the defendants, in interrupting the dance program on April 8, 2006, prevented the constitutionally protected expression from continuing and in effect "seized" the expression without prior judicial approval. However, the defendants assert that

- 57 -

no prior restraint occurred because the officers had probable cause to stop the performance and issue a citation to the owner.

The undisputed facts in this case establish that on April 7, 2006, during an alcohol license check, Village of Germantown police officers observed a flyer inside Diamonds Pub and Grill, the plaintiff's tavern, scheduling a nude dancing show for April 8, 2006. The undisputed facts also establish that on the afternoon of April 8, 2006, Germantown Police Captain Michael Snow met with the plaintiff and informed him that he could not present the erotic dance show and that if he did, the police would shut him down. Later, Lt. Schreihart advised the plaintiff that if he continued with the show, the Germantown Police Department would have no choice but to respond to Diamonds Pub and Grill and stop the show.

The undisputed facts further establish that at 7:00 p.m., the Germantown Police Department sent a plainclothes officer to observe the activities inside Diamonds Pub and Grill and to monitor for violations of the tavern's license. The undercover officer observed several dancers go up on stage, take off their shirts and expose their breasts and nipples, collect gratuities, engage in lap dances, and walk about the room with their breasts exposed. The undercover officer then advised his lieutenant of the ordinance violations which he had observed. The undisputed facts also establish that after the undercover officer reported the activity, officers, led by Captain Snow, entered the tavern and asked patrons to leave due to the fact that the tavern was being shut down.

Prior to shutting down the tavern, an undercover law enforcement officer observed violations of § 12.24, specifically, several dancers going up on stage, taking off their shirts and exposing their breasts and nipples, and then walking around the room with their breasts exposed. He also observed dancers collecting gratuities and engaging in lap dances. As

- 58 -

recognized by the court in <u>SOB, Inc. v. County of Benton</u>,[12] "the doctrine of prior restraint is only marginally involved here."  317 F.3d 856, 866 (8th Cir. 2003).  The doctrine of prior restraint recognizes "'the time-honored distinction between barring speech in the future and penalizing past speech.'" <u>Id.</u>  (quoting <u>Alexander v. United States</u>, 509 U.S. 544, 554 [1993]). The plaintiff cited to <u>Fort Wayne Books, Inc. v. Indiana</u>, 489 U.S. 46 (1989), an obscenity case, in support of his assertion that the defendants' interruption of the April 8, 2006, show was a prior restraint.

In <u>SOB, Inc.</u>, the Court of Appeals for the Eighth Circuit explained: "In obscenity cases, the Supreme Court has cautioned that police officers may not seize allegedly obscene materials without some prior judicial evaluation of the obscenity issue." 317 F.3d at 867 (citing <u>Roaden v. Kentucky</u>, 413 U.S. 496 [1973]).  Like the ordinance in <u>SOB, Inc.</u>, the ordinance at issue in this case is not obscenity-based and, therefore, no special rules apply.  <u>See</u> <u>Fort Wayne Books, Inc.</u>, 489 U.S. at 65-66 ("It is incontestable that these proceedings were begun to put an end to the sale of obscenity at the three bookstores named in the complaint, and hence we are quite sure that the special rules applicable to removing First Amendment materials from circulation are relevant here. This includes specifically the admonition that probable cause to believe that there are valid grounds for seizure is insufficient to interrupt the sale of presumptively protected books and films.").

Accordingly, probable cause to believe that the adult entertainment show violated the ordinance was all that was necessary to stop the show.  In this case, the defendants had such

---

[12]The plaintiff cited <u>SOB, Inc.</u>, for the idea that "[t]he law distinguishes between circumstances where the government seeks a penalty after the expression has occurred from those where the government prevents expression from occurring at all."  (Plaintiff's Brief at 31).

probable cause, and, therefore, their stopping of the show was not an unconstitutional prior restraint.

**Severance**

The defendants assert that § 12.24 contains zoning, licensing and operational provisions, many of which survive constitutional challenge. Specifically, with respect to §12.24(2)(b)(4), the defendants contend that §§ 12.24(2)(b)(1)-(3), as well as the other provisions contained in § 12.24, operate independently from § 12.24(2)(b)(4). The defendants maintain that § 12.24(2)(b)(4) is not an integral part of the definition of "adult cabaret" under § 12.24(2)(b). Rather, they assert, that it is one discrete part which is set apart from three other subsections that otherwise define an "adult cabaret". Finally, the defendants state that allowing the remaining provisions to stand, despite the alleged invalidity of § 12.24(2)(b)(4), is consistent with the objectives of the Village Board in adopting the ordinance.

The severability clause in § 12.24(28) provides: "If any section, subsection, or clause of this section shall be deemed to be unconstitutional or otherwise invalid, the validity of the remaining sections, subsections, and clauses shall not be affected thereby." "A severability clause can save the constitutionally viable remainder only if the invalidated elements were not 'an integral part of the statutory enactment viewed in it entirety.'" Schultz, 228 F.3d at 853 (quoting Zbaraz v. Hartigan, 763 F.2d 1532, 1545 [7th Cir. 1985]).

In Schultz, the court, "[i]n deference to the Ordinance's robust severability clause," determined that the unconstitutional provisions of the ordinance could be severed from the rest. In this case, § 12.24(2)(b)(4) is not an integral part of § 12.24(2)(b) and, therefore, can be severed from § 12.24(2)(b) and the rest of § 12.24. However, the court also concluded that

- 60 -

§§ 12.24(2)(b)(1), 12.24(2)(n), 12.24(2)(t) and 12.24(2)(v) were not narrowly tailored. These unconstitutional provisions can not be severed from the rest of § 12.24(2)(b).

**Conclusion**

In sum, the court concludes that it has subject matter jurisdiction over the plaintiff's action. The plaintiff's challenge to § 12.24 is not moot and the plaintiff has standing to challenge the ordinance. Additionally, the court concludes that §§ 12.24(2)(b)(1), 12.24(2)(n), 12.24(2)(t) and 12.24(2)(v) regulate businesses that have not been shown to generate negative secondary effects and, therefore, are not narrowly tailored. On the other hand, the ordinance's hours regulation, § 12.24(24), is narrowly tailored. The court further concludes that the ordinance leaves adequate alternative avenues of communication, namely sites 22A and 22B.

However, the court concludes that the term "regularly, commonly, habitually or consistently features" can be interpreted to mean "always features" and with such a construction, the ordinance does not apply to infrequent performances and does not cover too many places. However, § 12.24(2)(b)(4) does not affect the court's narrowing construction and, thus, it is overbroad. The court concludes that § 12.24(2)(b) is not vague. The court also concludes that the licensing provisions, § 12.24(5)(d) do not render the ordinance as unconstitutional prior restraint. Moreover, no unconstitutional prior restraint occurred on April 8, 2006. Finally, the court concludes that although § 12.24(2)( b)(4) can be severed from the ordinance, §§ 12.24(2)(b)(1), (2)(n), (2)(t) and (2)(v) cannot. Accordingly § 12.24(2)(b), the section of the ordinance defining adult cabaret is facially invalid.

- 61 -

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment be and hereby is **granted in part and denied in part as stated herein.** (Docket #53).

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment be and hereby is **granted in part and denied in part as stated herein.** (Docket #66).

**FINALLY, IT IS ORDERED** that the parties shall appear for a status conference on **November 8 at 2:30 p.m.** The conference will be held in Courtroom 282 of the United States Courthouse, 517 E. Wisconsin Avenue, Milwaukee, Wisconsin 53202.

Dated at Milwaukee, Wisconsin this 12th day of October, 2007.

BY THE COURT:

_____s/ Patricia J. Gorence_____
PATRICIA J. GORENCE
United States Magistrate Judge